UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

[ORIGINAL]

**CIVIL MINUTES - GENERAL**

**PRIORITY SEND**

| | |
|---|---|
| Case No. CV 07-2820 DSF (SHx) | Date August 1, 2007 |
| Title *InterMetro Communications, Inc. v. KMC Data, LLC*, et al. | |

Present: The Honorable DALE S. FISCHER, United States District Judge

| Paul D. Pierson | Not Present |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:** (IN CHAMBERS) Order STAYING Action Pending Referral to the Federal Communications Commission

## I. INTRODUCTION

Plaintiff InterMetro Communications, Inc. ("InterMetro") filed this action against Defendants KMC Data, LLC ("KMC") and HyperCube, LLC ("HyperCube") on April 30, 2007. On May 4, 2007 the Court issued an Order Re Plaintiff's Ex Parte Application for Temporary Restraining Order and Order to Show Cause Re Preliminary Injunction ("TRO Order"). The Court denied Plaintiff's request for a temporary restraining order, and ordered Defendants to appear before the Court on June 11, 2007 to show why a preliminary injunction should not be issued. (TRO Order 7.) On June 11, 2007, the Court denied Plaintiff's request for preliminary injunctive relief because Plaintiff had "failed to show any likelihood of irreparable injury or hardship." (Order Denying InterMetro Communication's Req. for Prelim. Injunctive Relief 5.) Also on June 11, 2007, the Court ordered "simultaneous briefing addressing whether the Court should refer this matter to the appropriate agency under the doctrine of primary jurisdiction." (Order re Briefing on Primary Jurisdiction 1.) Defendants' Brief Regarding Referral on the Basis of Primary Jurisdiction and Plaintiff's Brief Addressing Primary Jurisdiction Referral were filed on July 10, 2007. For the reasons set forth below, this matter is STAYED pending referral to the Federal Communications Commission ("FCC").

## II. BACKGROUND

This matter concerns the provision of prepaid calling card services to cellular phone users. As the Ninth Circuit has noted, "[t]he provision of telephone services is divided between local exchange carriers . . . and long distance carriers." California v.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

**PRIORITY SEND**

FCC, 75 F.3d 1350, 1356 (9th Cir. 1996). "Local exchange carriers ('LECs') originate, transmit, and terminate telephone communications to customers within a given geographic calling area." Qwest Corp. v. AT&T Corp., 479 F.3d 1206, 1208 (10th Cir. 2006); see also California, 75 F.3d at 1356 ("LECs generally provide all telephone services within their authorized local calling areas, and the vast majority of intrastate toll calls."). "Long-distance providers, or interexchange carriers ('IXCs'), enable customers in different local exchanges to call each other, generally by routing communications from one LEC network to the IXC network and from that IXC network to a different LEC network." Qwest, 479 F.3d at 1208; see also California, 75 F.3d at 1356 ("The IXCs run lines between local calling areas. They pay access fees to LECs to originate and to terminate long distance calls."). "In passing the Telecommunications Act of 1996 [the "Telecommunications Act"], Congress fundamentally restructured local telephone markets to promote competition." New Edge Network, Inc. v. FCC, 461 F.3d 1105, 1107 (9th Cir. 2006). Pursuant to that legislation, LECs were classified as either incumbent local exchange carriers ("ILECs") or competitive local exchange carriers ("CLECs"). "[A]ll former local-phone service monopolists" were classified as ILECs. MCI Telecomms. Corp. v. U.S. W. Commc'ns, 204 F.3d 1262, 1265 (9th Cir. 2000). New market entrants were classified as CLECs. Id.

KMC is a limited liability company wholly owned by HyperCube. (Mertz Decl. ¶ 2.)[1] KMC is a CLEC. (See Mertz Decl. ¶ 3.) KMC provides both interstate and intrastate access services to enable telecommunications companies to originate or terminate long distance calls. (Mertz Decl. ¶ 6.) These calls – made to end user customers – utilize the local network facilities of the public switched telephone network (the "PSTN"). (Mertz Decl. ¶ 6.) These access services are provided pursuant to KMC's FCC access tariff for interstate services, and pursuant to KMC's state access tariffs for intrastate services.[2] (Mertz Decl. ¶ 7.) KMC does business with wireless carriers and allows them to connect their customers' calls to the PSTN. (Mertz Decl. ¶ 9.)

InterMetro's wholesale customers (the "Prepaid Card Customers") provide

---

[1] The Mertz Declaration was submitted in connection with Plaintiff's TRO Application.

[2] The parties agree that KMC provides a "telecommunications service," and is a "common carrier" regulated by the Federal Communications Act of 1934, as amended by the Telecommunications Act. See generally AT&T Corp. v. Portland, 216 F.3d 871, 877 (9th Cir. 2000) ("A provider of telecommunications services is a 'telecommunications carrier,' which the Act treats as a common carrier to the extent that it provides telecommunications to the public . . . ."). "Every carrier is required to file a tariff with the FCC listing its schedule of charges." Brown v. MCI Worldcom Network Servs., 277 F.3d 1166, 1170 (9th Cir. 2002). "Once a tariff is approved, it binds both carriers and shippers with the force of law." Id. (internal quotation marks and alterations omitted).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

**PRIORITY SEND**

prepaid calling card services to cellular phone end users. (Harris Decl. ¶ 3.)[3] When an end user dials a toll-free number that belongs to one of InterMetro's Prepaid Card Customers, the wireless carrier routes the call to KMC. (Harris Decl. ¶ 5; Mertz Decl. ¶ 11.) KMC then routes the call over the PSTN to InterMetro. (Harris Decl. ¶ 5; Mertz Decl. ¶ 9.) In order to complete the delivery of these calls to InterMetro, KMC provides access services. (Mertz Decl. ¶ 10.) These access services include switching, transport, and a database query known as a "dip." (Mertz Decl. ¶ 10.) When KMC performs a dip, it accesses a centralized industry database known as the SMS/800. (Mertz Decl. ¶ 11.) The SMS/800 is the central repository for the creation and maintenance of toll-free telephone numbers. (Mertz Decl. ¶ 11.) One of the central pieces of information included in the SMS/800 is a four-digit carrier identification code ("CIC"). (Mertz Decl. ¶ 11.) When KMC queries the SMS/800 to determine how to route a particular toll-free call, the CIC tells KMC where to send the call and to whom access charges should be billed. (Mertz Decl. ¶ 11.) Once KMC routes a call to InterMetro, InterMetro converts the signal to internet protocol ("IP"). (Harris Decl. ¶ 2.) The call is then routed through InterMetro's network to its Prepaid Card Customers. (Harris Decl. ¶ 5.) Finally, the call path to the destination telephone number is completed by Prepaid Card Customers and other telecommunications companies. (Harris Decl. ¶ 4.)

In April 2006, KMC began delivering toll-free calls to CIC 0405. (Mertz Decl. ¶ 12.) KMC initially believed this CIC was assigned to Penn Telecom, Inc. (Mertz Decl. ¶ 12.) In July 2006, Rick Sanchez, InterMetro's Vice President of Operations, advised KMC that calls on CIC 0405 should be billed to InterMetro. (Mertz Decl. ¶ 13.) KMC has billed InterMetro for access services associated with the delivery of wireless toll-free calls from April 2006 to the present. (Mertz Decl. ¶ 16; Harris Decl. Ex. A.) InterMetro apparently has not paid for any of these access services. Defendants have represented that, although KMC is still providing switched access services to InterMetro for a limited number of wireless calls, the majority of InterMetro's traffic was disconnected on May 4, 2007. (See Errata – Supplemental Mem. of P. & A. in Opp'n to Application for Prelim. Inj. 2.)

## III. LEGAL STANDARD

"The doctrine of primary jurisdiction 'is a prudential doctrine under which courts may, under appropriate circumstances, determine that the initial decision-making responsibility should be performed by the relevant agency rather than the courts.'" Davel Commc'ns, Inc. v. Qwest Corp., 460 F.3d 1075, 1086 (9th Cir. 2006). The doctrine applies when "enforcement of a claim subject to a specific regulatory scheme requires resolution of issues that are within the special competence of an administrative

---

[3] The Harris Declaration was submitted in connection with Plaintiff's TRO Application.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

PRIORITY SEND

body." Farley Transp. Co. v. Santa Fe Trail Transp. Co., 778 F.2d 1365, 1370 (9th Cir. 1985) (internal quotation marks omitted). "The doctrine does not, however, require that all claims within an agency's purview be decided by the agency." Davel Commc'ns, 460 F.3d at 1086 (internal quotation marks omitted).

Although there is no "fixed formula" for applying the primary jurisdiction doctrine, courts in the Ninth Circuit traditionally examine the following four factors: "(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme that (4) requires expertise or uniformity in administration." Id. at 1086-87 (quoting United States v. Gen. Dynamics Corp., 828 F.2d 1356, 1362 (9th Cir. 1987)). "Where an issue falls within an agency's primary jurisdiction, the district court enables 'referral' of the issue to the agency." Id. at 1087. The Ninth Circuit has explained:

> 'Referral' is the term of art employed in primary jurisdiction cases. In practice, it means that a court either stays proceedings, or dismisses the case without prejudice, so that the parties may pursue their administrative remedies. There is no formal transfer mechanism between the courts and the agency; rather upon invocation of the primary jurisdiction doctrine, the parties are responsible for initiating the appropriate proceedings before the agency.

Syntek Semiconductor Co., Ltd. v. Microchip Tech. Inc., 307 F.3d 775, 782 n.3 (9th Cir. 2002) (internal citation omitted). "[I]f . . . the primary jurisdiction doctrine applies on any set of facts that could be developed by the parties, there is no reason to await discovery, summary judgment, or trial, and the application of the doctrine properly may be determined on the pleadings." Davel Commc'ns, 460 F.3d at 1088.

## IV. DISCUSSION

Plaintiff asserts that the Court should allow discovery to conclude, and that "the relevant law is sufficiently settled for the Court to resolve this matter through summary judgment." (Pl.'s Brief Addressing Primary Jurisdiction Referral 1.) Defendants contend that the action should be stayed so that the FCC may determine whether InterMetro is subject to KMC Data's access charges. The Court concludes that this matter should be referred to the FCC.[4]

---

[4] Plaintiff suggests that two issues are properly referred to the California Public Utilities Commission (the "PUC"). The Ninth Circuit has indicated that, under certain circumstances, it may be improper for a district court to refer issues to a state agency. Cost Mgmt. Servs., Inc. v. Wash. Natural Gas Co., 99 F.3d 937, 949 n.12 (9th Cir. 1996) ("[W]e have emphasized that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

**PRIORITY SEND**

Plaintiff argues that it should not be subject to access charges, primarily on the basis that it provides an information service, rather than a telecommunications service. Plaintiff's classification is crucial to the determination of this action because "telecommunications service" providers are generally subject to tariffs governing access charges, whereas "information service" providers are not. E.g., FTC v. Verity Int'l, Ltd., 443 F.3d 48, 62-63 (2d Cir. 2006) (explaining the consequences of a service provider's classification).

Both of these mutually exclusive categories are defined in the Telecommunications Act. Id. at 62. "The term 'telecommunications service' means the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used." 47 U.S.C. § 153(46). "Telecommunications" is defined as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C. § 153(43). "The term 'information service' means the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service." 47 U.S.C. § 153(20). A service with an information component is properly classified as an "information service" if the information component is "sufficiently integrated with the finished service to make it reasonable to describe the two as a single, integrated offering." Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 990 (2005); see also In the Matter of Regulation of Prepaid Calling Card Services, 21 F.C.C.R. 7290, WC Docket No. 05-68, ¶ 14 (FCC June 30, 2006) (the "Prepaid Calling Card Order") ("[T]he relevant question [in distinguishing between telecommunications and information services] is whether an entity is providing a 'single information service with communications and computing components' or 'two distinct services, one of which is a telecommunications service.'").

The development of voice-over-internet protocol ("VoIP") services has presented a challenge to the complex regulatory scheme governing traditional telecommunications services. For that reason, a number of courts have applied the primary jurisdiction doctrine when called on to determine whether providers of VoIP services are subject to intercarrier access charges.

---

because 'the primary jurisdiction doctrine is in effect, a power-allocating mechanism, a court *must not* employ the doctrine *unless* the particular division of power *was intended by Congress*.'"). Because this dispute revolves around a question properly referred to the FCC, the Court need not expressly decide whether other issues may be referred to the PUC. This Order neither prohibits nor sanctions referral of issues to the PUC or other relevant state agencies.

For instance, in Southwestern Bell Telephone., L.P. v. Vartec Telecom, Inc., ten LECs sought to recover federal and state tariffs for long-distance calls transmitted by the defendants. No. 4:04 CV 1303(CEJ), 2005 WL 2033416, at *1 (E.D. Mo. Aug. 23, 2005). The plaintiffs alleged that the disputed calls originated on a LEC network, were transmitted to one of the defendants on the PSTN, were converted to and transmitted in IP, were reconverted for transmission over the PSTN, and were "returned to a[] LEC for delivery to the called party." Id. at *2. As here, the plaintiffs argued that "deferral" to the FCC was inappropriate because the matter "concern[ed] tariff enforcement, an issue beyond the authority of the FCC." Id. at *4. The court disagreed, finding that determination of whether the defendants were subject to the tariffs presented technical questions beyond the expertise of the court. In applying the primary jurisdiction doctrine, the court noted in part that "[t]he FCC's ongoing Rulemaking proceedings concerning VoIP and other IP-enabled services [made] deferral particularly appropriate." Id. Other district courts have arrived at similar conclusions. See Frontier Tel. of Rochester, Inc. v. USA Datanet Corp., 386 F. Supp. 2d 144, 149 (W.D.N.Y. 2005) (staying action on the ground that imposition of interstate access charges on VoIP service providers "involves technical and policy considerations that are particularly within the FCC's area of expertise and that are within its discretion"); see also S. New England Tel. Co. v. Global Naps, Inc., No. Civ.A 304CV2075JCH, 2005 WL 2789323, at *6 (D. Conn. Oct. 26, 2005) (citing Southwestern Bell and Frontier, and staying the action to the extent it "regard[ed] traffic that involve[d] IP at some point in its transmission"); cf. Comcast IP Phone of Mo., LLC v. Mo. Pub. Serv. Comm'n, No. 06-4233-CV-C-NKL, 2007 WL 172359, at *6 (retaining jurisdiction, and noting that "[u]nlike the *Frontier* case, no technical issues have been presented to this Court").

The Court is persuaded that Plaintiff's status as an information service provider – the central issue in this suit – is not primarily a question of fact susceptible to resolution during discovery. Rather, determination of Plaintiff's proper classification primarily involves technical and policy considerations uniquely within the province of the FCC. Plaintiff relies chiefly on two FCC orders. First, citing *In the Matter of Petition for Declaratory Ruling that AT&T's Phone-to-Phone IP Telephony Services Are Exempt from Access Charges*, 19 F.C.C.R. 7457, WC Docket No. 02-361 (FCC Apr. 21, 2004) ("IP-in-the-Middle Order"), Plaintiff argues that it offers an "information service" because it performs no net protocol conversion. Second, citing the Prepaid Calling Card Order, Plaintiff argues that it does not provide a prepaid card service to consumers, and that it therefore is not subject to access charges. Contrary to Plaintiff's representations, the scope of these regulatory orders is not sufficiently clear that this matter easily may be resolved on summary judgment. In fact, to date, the FCC has not decided whether to classify VoIP as a telecommunications service or as an information service. *In the Matter of Universal Service Contribution Methodology*, 21 F.C.C.R. 7518, WC Docket No. 06-122, ¶ 35 (FCC June 27, 2006). "These issues are currently the subject of [the FCC's] *IP-Enabled Services Proceeding* where the Commission is comprehensively

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

**PRIORITY SEND**

examining numerous types of IP-enabled services .... That proceeding will resolve important regulatory matters with respect to IP-enabled services generally, including intercarrier compensation ...." *In the Matter of Vonage Holdings Corp.*, 19 F.C.C.R. 22404, WC Docket No. 03-211, n.46 (FCC Nov. 12, 2004); see also Minn. Pub. Utils. Comm'n v. FCC, 483 F.3d 570, 577 (8th Cir. 2007) (noting that the FCC has not yet concluded its comprehensive review of IP-enabled services). As here, when an agency is in the midst of construing the scope of a regulation, judicial abstention is particularly appropriate. See Davel Commc'ns, 460 F.3d at 1090 (finding that "[a]t least unless and until the FCC declines to determine the scope of the [disputed order], questions regarding that scope, including those at the core of this case, are within the agency's primary jurisdiction"); see also Frontier Tel. of Rochester, Inc., 386 F. Supp. 2d at 150 ("[T]here is clearly a substantial risk of inconsistent rulings here, since the Court cannot say how the FCC will address the issues before it.").

## V. CONCLUSION

For the reasons set forth above, this action is STAYED pending referral to the FCC. The parties are to file a joint status report no later than December 17, 2007 and every 120 days thereafter. Each joint status report shall state on the caption page the date the next report is due.

IT IS SO ORDERED.

Initials of Deputy Clerk ℋ